UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRANDON BOSTIAN, | |
| Plaintiff, | Case No. 2:23-cv-01975-JFM |
| vs. | |
| | 601 Market Street |
| NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK), | Philadelphia, PA 19106 |
| Defendant. | Tuesday, December 12, 2023 |
| | 12:05 P.M. |

TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE JOHN F. MURPHY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff: ROBERT S. GOGGIN, III, ESQ.
Goggin & Duckworth, P.C.
1420 Walnut Street, Suite 1108
Philadelphia, PA 19102
(215) 735-8780
rgoggin@keller-goggin.com

For the Defendant: RICHARD K. HOHN, ESQ.
Hohn & Scheüerle
1700 Market Street, Suite 3242
Philadelphia, PA 1910
(215) 496-9995
rhohn@dverdict.com

(APPEARANCES CONTINUED)

Audio Operator: Electronically Recorded
by Kenny Duvak

Transcription Service: RedDoor Legal Services, LLC
44 Valley Forge Road
Bordentown, N.J. 08505
(973)985-3668
www.reddoorlegalservices.com

Proceedings recorded by electronic sound recording:
transcript produced by transcription service.

APPEARANCES (CONTINUED):

For the Defendant:

LINDSAY HARRISON, ESQ.
Jenner & Block
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
(202) 639-6865
lharrison@jenner.com

- and -

HUIYI CHEN, ESQ.
Jenner & Block
353 N. Clark Street
Chicago, IL 60654-3456
(312) 840-7389
hchen@jenner.com

- and -

JOSHUA ARMSTRONG, ESQ.
Jenner & Block
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
(202) 637-6310
jarmstrong@jenner.com

## INDEX


| PROCEEDING | PAGE |
|---|---|
| Evidentiary hearing | 5 |


## I N D E X T O W I T N E S S E S


| NAME | DIRECT | CROSS | RE-DIRECT | RE-CROSS |
|---|---|---|---|---|
| Robert Goggin | | | | |
| by the Court | 8 | | 33 | |
| by Ms. Harrison | | 19 | | |
| Brandon Bostian | | | | |
| by the Court | 38 | | | |
| by Mr. Goggin | | 40 | | |
| M. Gregory Bostian | | | | |
| by the Court | 42 | | 44 | |
| by Mr. Goggin | | 44 | | |
| Richard Hohn | | | | |
| by Ms. Chen | 46 | | | |
| by Mr. Goggin | | 48 | | 71 |
| Barbara Maine | | | | |
| by Ms. Chen | 52 | | | |
| by Mr. Goggin | | 58 | | |
| Bill Herrmann | | | | |
| by Ms. Chen | 60 | | 69 | |
| by Mr. Goggin | | 64 | | |

## I N D E X   T O   E X H I B I T S


| NUMBER | DESCRIPTION | ID | EVID |
|---|---|---|---|
| Exhibit 2 | Email/memo, indemnification | 9 | |
| Exhibit 5 | Receipt | 11 | |
| Exhibit 3, 3a | Emails, Mr. Hohn and Mr. Goggin | 14 | |
| Exhibit 4 | Criminal bills | 15 | |
| Exhibit 1 | Bylaws, indemnification | 16 | |
| Exhibit 6 | Letter to Mr. Hohn | 30 | |
| Exhibit 7 | Deposition transcript, Ms. Maine | 32 | |

AFTERNOON SESSION

(Proceedings commence at 12:08:22 p.m.)

COURT OFFICER: All rise. United States District Court for the Eastern District of Pennsylvania is now in session, the Honorable John F. Murphy is presiding.

THE COURT: All right. Good afternoon, everyone. Please, sit.

MR. GOGGIN: Good afternoon, Your Honor.

MR. HOHN: Good afternoon, Your Honor.

MS. HARRISON: Good afternoon.

THE COURT: All right. So, we are here today for number 23 cv 1975, Bostian v. Amtrak. Let's do introductions first, please starting on the Plaintiff's side.

MR. GOGGIN: Good morning, Your Honor. Robert Goggin, and with me is Brandon Bostian.

THE COURT: Okay. Good afternoon.

MR. HOHN: Good morning, Your Honor. Richard Hohn, H-O-H-N, Hohn and Scheüerle, local counsel for Amtrak in this matter.

THE COURT: Good morning.

MR. HOHN: With me is Ms. Lindsay Harris, Ms. Huiyi Chen, and also Joshua Armstrong of the Jenner firm. We also have a witness -- Barbara Maine, previous -- a previous manager for the New York office of Amtrak, and with her is

Tom Montgomery, current manager of Amtrak.

THE COURT: All right.

MR. HOHN: Thank you, Your Honor.

THE COURT: Thank you. Okay. So, this is going to be, I think, an evidentiary hearing. And the -- the suggestion was initially made by Amtrak to have an evidentiary hearing. So, I'd be interested in hearing your proposal for how you would like to proceed. We'll talk about that first and get a little schedule of what we're going to do.

MS. HARRISON: Thank you, Your Honor. So, we -- we also have available, if the Court would like to hear from Mr. Herrmann, who was the -- the addressee of the letter that is sort of the main subject of -- of the hearing. And we can make him available as well to testify.

I think -- you know, I was kind of curious if you would be -- prefer to do the questioning of opposing counsel, or -- or have us do it. I think I would defer to Your Honor in terms of your preference there.

THE COURT: Okay.

MS. HARRISON: It might be more expeditious if you were to do the questioning, and --

THE COURT: You were thinking of starting with them before your -- and do your witnesses after?

MS. HARRISON: I think so. I mean, if -- it's an

evidentiary hearing technically on their motion to dismiss without prejudice, and so that's how I conceived it.

THE COURT: Okay.

MS. HARRISON: If you would prefer to hear from Ms. Maine first or Mr. Herrmann, we can do that as well.

THE COURT: No, that's fine. Mr. Goggin, let me ask you this question. So -- I think it does make sense, probably, for you to go first. You don't have another lawyer here to ask you questions, so I'll probably -- I'll ask you a few basic questions just to set it up, and it will be a fairly open-ended direct type question, so you can give something of a narrative. Because, I don't have an affidavit or anything from you in the record, so I really have no place to start. And then once you've done -- and if you want to discuss any of the exhibits or anything like that, that's fine, too. And then once you've done that I would give Amtrak counsel a chance to cross.

MR. GOGGIN: That's fine with me, Your Honor.

THE COURT: That's okay with you?

MR. GOGGIN: Yes, sir.

THE COURT: Do either of you want to give a little preliminary statement, or should we just dive in? I mean, I've read everything. I don't know if you have anything to add to the briefing, preliminarily.

MS. HARRISON: I mean, we were permitted to file a

sur-reply, so --

THE COURT: Yeah.

MS. HARRISON: I feel okay just proceeding.

THE COURT: Okay.

MS. HARRISON: But, if -- if Mr. Goggin would prefer to give a comment, that's fine. We have no objection.

THE COURT: Are you ready to get going?

MR. GOGGIN: Yes, sir.

THE COURT: All right. Why don't you come take the stand?

COURT CLERK: Sir, remain standing for a moment. State your name for the record.

MR. GOGGIN: Robert Goggin, G-O-G-G-I-N.

COURT CLERK: Please raise your right hand for me.

R O B E R T G O G G I N, WITNESS, SWORN.

COURT CLERK: Thank you, sir. --

DIRECT EXAMINATION BY THE COURT.

Q. All right. Mr. Goggin, you are aware that we're here on your motion to dismiss, and some issue that have been raised in the opposition and the briefing that followed about the -- the nature of the 2017 letter that's an exhibit to the complaint, and then whether or not such a letter ever actually existed and the circumstances surrounding that. So, let me ask you to give -- if you give me maybe in a narrative format, an explanation of how that -- the events that

transpired in 2017 and then what led to the filing of this complaint and the letter -- the copy of the letter that's included with the complaint.

A. Yes, sir. I'll go back to 2015, when the accident actually occurred, the derailment of Amtrak train 188. At some point in time I had met with the Bostian Family and sent an email regarding indemnification to Amtrak. That email I do not have, but it is memorialized, and I've -- I've given the Court a few exhibits in Exhibit 2, which is an email from Amtrak dated June 29, '15. And in the first paragraph it -- it says in following up to your attorney Robert Goggin's email dated June 22, '15 requesting Amtrak provide you a defense in all claims and civil lawsuits filed against you related to the Frankford Junction derailment of May 12th, '15. I sent that, and then a lot of time went on and investigation with the NTSB, many, many years.

Ultimately, Mr. Bostian -- Brandon Bostian was in the Philadelphia Police Department, where I picked him up subsequent to the derailment. Met with -- he and his family had come up from Arkansas, met with them. Sent the email out that we just referred to, and then waited to see what the investigation would -- would show, where it was going, what was happening. And that took an exceedingly long time. But, some time subsequent to the accident, I filed on behalf of Mr. Bostian a Federal Employer's Liability Act claim. That

was kind of on hold until the NTSB issued their report, which ultimately they did.

Sometime in 2017 Mr. Bostian was charged by the Attorney General's Office for the happenings in the crash. The family again came up. We discussed criminal defense. The family met with several criminal defense attorneys in my office. Ultimately they chose Brian McMonagle to represent them. I worked with Brian McMonagle on that. Again, the Bostians brought up indemnification sometime in 2017. I sent a letter in 2017 regarding indemnification, and having discussed the indemnification -- just discussed it with Brian McMonagle, who wasn't really interested in it. But, certainly Greg Bostian was interested in it, the father, because they paid ultimately four hundred plus thousand dollars in criminal defense. I discussed this with him. I had gone over it myself. And their bylaws indicate that -- that they'll indemnify for things such as this, and initially they did indemnify Mr. Bostian back in 2015.

There was a flurry of lawsuits that came in from victims. I imagine everybody surrounding that accident. I sent off that email. I got a response that they were going to indemnify for those active lawsuits and -- and any other lawsuits that came. I was under the impression that I didn't need to send anything else, even after Mr. Bostian was arrested. I thought my language was catch-all in my email,

but Greg Bostian wanted it sent, so I sent it. There's nothing to do between when I sent that email and post verdict, which was again years.

The case went from the Municipal Court, got thrown out of court. It got re-instated and went up the Supreme Court in Pennsylvania, came back down and ultimately got tried. In 2022 -- sometime in 2022 Brandon Bostian was found not guilty on all counts.

Subsequent to that, I had spoken with I think Rick Hohn and Barbara Maine regarding indemnification. I said here's the -- what is owed and what have you. I believe Barbara Maine said that at some point in time, we don't know anything about that. So, I went back to look for my email of 2015, because frankly, Judge, the -- the memo, which has been marked Number Two, although I'm sure I saw it, I had no real recollection of -- of that memo at the time.

In 2015, if you'll go to my Exhibit 5 -- in 2015 my computer was stolen from my office. I went back to the Micro Center where I buy my computers --

Q. Why don't we lay a little foundation on Exhibit 5. And just for cleanup, Exhibit 2 --

A. I'm sorry, Your Honor.

Q. Yeah, I just want to -- just for the record, so -- Exhibit 2, the memorandum was attached to the complaint. It's on the docket already. It's docket number 1-6, so

that's Exhibit 2. Now, we're talking about what you've marked Exhibit 5 --

A. Yes, sir.

Q. So, why don't you give me a little foundation?

A. There is a Micro Center, which is a computer store in the general area where I live. I went there and asked if they had the receipts of my computer purchases, basically from the time I -- that store came in. On top is 8/20/15, which is when I went and purchased a new computer for the one that was stolen from my office. I could not locate the email which was sent. And at the time, Judge, what has been marked Exhibit 2, was not in my -- was not in my memory as to how I was going to somehow piece together that I had requested indemnification.

Barbara Maine had asked for a copy of whatever I sent in 2017. And this is when I realized that I didn't have the email and I didn't have the -- I was looking for the letter, and I could not find the letter. And I was -- I will tell you that I was a bit panicked. It's kind of difficult thing to tell my client's father, that I don't have the initial request for indemnification or the second request for indemnification. The -- at the time they needed the letter, I was certain that I would find it. But, there was some reason that -- I don't remember the time frame of what I was doing. I put one together and I emailed it to Barbara Maine.

It was --

Q. And when you say you put one together and emailed it --

A. I typed one up.

Q. Is that the -- is that the same one that's attached to the complaint --

A. Yes, it is.

Q. And it's Document 1-7 on the docket?

A. Yes.

Q. Okay. Go ahead.

A. I typed one up, thinking I'll find it when I get some time to get some -- and locate this email. Subsequent to that, Your Honor -- prior to that -- let me check that. In twenty -- if you go back to Exhibit 5, the second page, which is also a receipt from Micro Center. Now, I'm in a new office and it's approximately seven years later, and again my computer was stolen. And I thought that everything would be kept in my -- however it transfers, but I could not find the letter. So, I was a bit panicked, and that -- that caused the initial letter that I wrote.

Several days later I had -- depositions with Barbara Maine in the Bostian case -- corporate designee depositions, and I brought the copy of that letter with me, the one that -- just discussed. And I handed it to her, and I said this was the letter that I sent. I said, it is -- it's not an original. And, I did that, Judge, because I was

-- I couldn't find it, and I was panicked. And I'm thinking what am I -- what have I gotten myself into by doing this? That was the end of the conversation. There was no dec action yet contemplated by me.

Mr. Hohn had indicated that he was there at that time. He indicated that he had never gotten that letter. But, subsequent to that, as in Exhibit 3, during the course of our discussion we had been talking about the bills for the criminal matter, back and forth. I had never heard anything about the indemnification, that they were claiming that I had never asked for indemnification. I was of the opinion that my email in 2015 covered the indemnification. I've found the memo that was marked, I believe it's Exhibit 2, that we discussed earlier. And, comfortable with my memo -- the memo of 2002 (sic), I proceeded onward with indemnification?

Q. I'm sorry, 2002?

A. I'm sorry, no Exhibit 2. Excuse me.

Q. Exhibit 2, okay.

A. I proceeded on with indemnification -- discussions of settling the case, including indemnification with Mr. Hohn. And I -- I attached a couple emails, I believe they're Exhibit 3 and 3a.

Q. Yeah, you had mentioned Exhibit 3 in passing. Could you -- I have them in front of me, your copies of 3 and 3a, could you just lay the foundation here?

A. Yes, yes. These are emails from January 26, '23. Bostian v. Amtrak, and these are in the FELA matter that we were discussing. Richard Hohn saying, did you get the criminal bills together yet? And then in 3a, there they are. I had sent him the criminal bills, and I have them marked in this packet as Exhibit 4, Your Honor.

Q. Exhibit 4 are the -- the criminal bills?

A. Yes, sir.

Q. Discussions went on, and on, and on really forever. And, then when I thought they were just going nowhere we had the FELA matter coming up. There was an issue in the FELA matter where Mr. Hohn was claiming that the criminal charges are not one of the consequential damages. And I thought it would be quicker and simpler -- and the backdrop to that is we had a discovery hearing on a matter regarding indemnification. And Mr. Hohn gave his -- his position. And I was told by the Judge that FELA is worker's comp to her, and that -- I thought after hearing that, and I didn't whether this would be the judge that tries the case, I decided to file a dec action to separate the two, just in case. I thought it would be quicker. I thought it would be simpler. And I thought my 2015 email covered what went on. We had our scheduling conference with Your Honor, and we also had a date certain in the FELA matter. And the resolution of the dec action would have been after a resolution of the FELA

matter in C.P. Court in Philadelphia.

And, so I discussed with Mr. Bostian that we can't -- we can't actually try them both, and it's simpler and cleaner to put them into the consequential damages in the -- matter, as opposed to spending all this time and energy in the dec action and getting a decision later, rather than sooner. And that was the decision that we made, and that's when I filed to voluntarily withdraw the matter.

I can tell you, sir, that it is embarrassing that I wrote up that letter. It is not my character, not things I normally do. But, I did not want to have to tell the Bostians that I had not the email nor the letter.

There would be no reason for me to bring a letter that I had sent a few days before via email to Barbara Maine. There would be no reason for me to bring that letter to a deposition a few days or a week later. I -- I don't know the exact number of days, other than to say this is not an original and I don't want to -- I don't want to --

And, again, months, and months, and months went by and there was no issue raised until the dec action was filed. And the issue of letting Amtrak know in 2017, whether they got the letter or they did not, in 2017 and doing nothing until 2022 is simply because in my -- my reading of the bylaws and in my discussion with Brandon Bostian there is a caveat -- and I'll refer you to Exhibit 1, Your Honor, which

is the indemnification portion of the bylaws, Section 3.2. Where it says -- if I can cut to the middle of this paragraph? In any proceeding by reason of the fact that such person -- excuse me -- a little bit. I think it would probably be better if I just read the paragraph.
Q. You may.
A. As authorized pursuant to Section 9.01 of the bylaws, Amtrak's policy -- with respect to its present and former employees and agents is to indemnify and advance expenses to any such employee or agent acting within the scope of their duties to Amtrak with respect to any liabilities or losses, including expenses, judgments, and amounts paid in settlement incurred by such person, or on his or her behalf in any proceeding by reason of the fact that such person was or is an employee or agent, provided that the employee or agent acted in good faith and in a manner the person reasonably believed to be in, or not opposed to, the best interest of Amtrak. And in the case of a criminal proceeding, must not have had reasonable to believe that his or her conduct was unlawful.
As Mr. Bostian had been charged criminally, it was my opinion that we would have to wait until verdict to raise the issue of indemnification, because that's the issue for the jury. And if he was found guilty there is not only no indemnification, but there was most likely no FELA case

either, but he was found not guilty. So, that's the reason we sat idly by and twiddled our thumbs waiting for resolution. And that's the reason the issue came up again in discussions in 2022 -- Mr. Hohn and Barbara Maine.

Q. Okay. The Exhibit 1 that you mentioned just, again for the sake of the record, is docket number 1-5, it was an attachment to the complaint.

All right. Well, let me come back to 2017. I have probably a bunch of follow-up questions, I'm just going to ask a couple before I turn over for cross. But coming back to 2017, I see as a key issue that I'm trying to get to the bottom of is going to be whether the -- whether the letter in 2017 that -- what you filed with the complaint at docket 1-7 is a -- said to be a recreation of, whether that letter origin -- actually existed. And, so what can you tell me -- any circumstantial evidence, any documentary evidence, what can you tell me, any indicia or circumstances that would support the existence of this letter originally in 2017?

A. Judge, all I have is that I was asked by Greg Bostian to send a letter, and I sent it. Specifically -- it was not that letter, I sent one. I wrote that letter, because I couldn't find it and I was certain that I would be able to, but I was not.

Q. On the recreation -- what I'm calling it, just for the sake of convenience. The recreation at docket number 1-7,

how did you decide on the date May 30th, 2017?

A. I knew that he was arrested sometime in 2017. And I -- I tried as best I could to recall my conversation with his father, around the time that was.

THE COURT: Okay. Counsel, we can have cross.

MS. HARRISON: Thank you, Your Honor.

CROSS-EXAMINATION BY MS. HARRISON:

Q. Hi, Mr. Goggin. You drafted the complaint in this case; correct?

A. I did.

Q. And the complaint does not disclose anywhere that Exhibit D is not an original; correct?

A. Correct.

Q. And the face of Exhibit D also does not disclose that it is not an original; correct?

A. Correct.

Q. Okay. And you read Amtrak's answer in this case that -- that we submitted?

A. I'm sure that I did.

Q. Okay. And in Amtrak's answer, you understand that Amtrak denied that the letter attached as Exhibit D to the complaint was ever sent or received by Amtrak in 2017; correct?

A. Yep.

Q. Okay. And after reading Amtrak's answer you didn't

reach out to Amtrak, or myself, or any of my co-counsel to explain that the letter you attached to the complaint was not an original; did you?
A. I did not. At -- I don't know whether at the time that you responded to the complaint anyone from Amtrak had said they had not received -- well, I guess -- Barbara Maine must have said it to me already. I did not.
Q. Okay. And the parties then prepared a 26(f) joint report in this case; correct?
A. Correct.
Q. Okay. And in that report Amtrak again stated it had never received a letter in 2017 from you seeking indemnification for the criminal defense costs; correct?
A. You had indicated that you had never see -- gotten any letter for indemnification in a criminal. I believe I said there was an email in 2015, which was the catchall.
Q. Okay. And you also said in the report -- one moment. Plaintiff sent a second request for indemnification during the criminal proceedings on May 30th, 2017. Amtrak claims this was not received. However, it was -- as you -- you claim, it was sent; correct?
A. I sent a letter at the time. The letter that you are talking about now was received by Amtrak, because I -- I believe I emailed it Barbara Maine and I handed it to Barbara Maine several days later.

Q. So, the -- the recreation, let's call it, in '22?
A. Yes.
Q. Okay. But, what about the second request? So, you wrote in this joint Rule 26(f) report submitted to the Court that Plaintiff sent a second request for indemnification during the criminal proceedings on May 30th, 2017. You don't know actually that it was May 30th; do you?
A. I do not.
Q. Okay. And you don't have a copy of that letter?
A. No.
Q. And you knew that Amtrak claimed it was not received; correct?
A. I did.
Q. And the Rule 26(f) report also doesn't say that the recreation was a recreation and not an original; correct?
A. Correct.
Q. And Amtrak served discovery requests to Mr. Bostian in this case; correct?
A. Yes, they did.
Q. And some of the requests asked about the circumstances around creating and sending the letter that is attached as Exhibit D to the complaint; correct?
A. Correct.
Q. And you never responded to Amtrak's discovery requests; right?

A. No, I filed a motion to withdraw.

Q. Right, and a motion to dismiss without prejudice; correct? Yes. And I called you after you filed that motion and explained to you we would be opposing dismissal without prejudice, because we believed that you had attached a fabricated exhibit to your complaint; correct?

A. Yes.

Q. And in that conversation you did not say to me it was a recreation, not an original; did you?

A. I did not.

Q. Okay. And I sent you a copy in advance of Amtrak's opposition brief opposing dismissal without prejudice; correct?

A. Yes.

Q. And you did not respond with any comment when I did that either, about the -- the substance of the opposition or about the recreation of the letter; correct?

A. I did not.

Q. Okay. So, the reply brief in support of dismissal without prejudice is the first time you told Amtrak's counsel, me, that you recreated this supposed 2017 letter; correct?

A. I told Barbara Maine. Richard Hohn was there. I don't know that he was listening to our conversation when I told Amtrak that that letter was not an original.

Q. You never told Amtrak's counsel in this litigation, despite discovery requests --
A. I did not.
Q. And briefs, and conversations --
A. I did not respond to the discovery, so -- because I -- I had discussions with Brandon and we were going to withdraw -- or request a dismissal of the matter.
Q. Okay. When you originally emailed the recreated letter to Ms. Maine in October of 2022, you did not say in the email that this was a recreation; did you?
A. No, I thought I would find it and be able to fix the problem. I had been dealing with Barbara Maine for many, many years, and when I -- when I sent that out I was certain that I would be able to find the letter, but I was not.
Q. Okay. And isn't it possible the reason you couldn't find the letter is because you forgot to send it in 2017?
A. I sent a letter in 2017. Can I tell you the exact date that I sent the letter? No. I've had -- I've had the Bostians as clients since 2015 through a million things within the NTSB, within the investigations from the FBI, the Secret Service, the Philadelphia Police Department, the Amtrak Police Department. There were a million details. Everything, in my opinion, got dealt with well. I could not find the letter. I -- I stand here, I don't have the letter. I can't tell you the date that I sent the letter. I know I

sent it subsequent to his arrest. I don't have -- I don't keep a timesheet. That's not how I work. I don't have it.
Q. Sounds nice --
A. I wish -- I wish that I did. I wish that I did. I -- I actually wish that I never recreated it and stamped up and down and said my email of 2015 that I also didn't have is enough. That's what I have.
Q. When you requested indemnification for civil claims for Mr. Bostian in 2015 Amtrak responded within one week; correct?
A. Yes, there were active civil cases happening.
Q. Okay. And in 2017 there was an active criminal investigation and indictment; correct?
A. Sometime in 2017.
Q. Okay. And -- but you got no response to this supposed letter in 2017, not within a week or at any other time; correct?
A. I'll be honest with you, I didn't expect to. I -- I expected, as I told him, that we would have to wait until the end of the criminal trial to -- to deal with this at all.
Q. You wouldn't expect Amtrak to respond and say under the policy he's not entitled to indemnification?
A. I -- I wouldn't expect that at all, because they had already under the policies indemnified him. But, the truth of the matter is I represented Amtrak's unions for thirty

years, and there's enumeral amounts of times where I've sent something off to Amtrak and heard nothing about it. So, I -- was I -- was I surprised? No. Did I expect not to hear anything? Yes. And here we are.

Q. So, we -- we spoke a little bit about Exhibit 1, this is your -- your Exhibit 1 --

A. Mmm hmm.

Q. Which is the Amtrak Indemnification Policy. It expressly provides for indemnification in criminal matters; correct?

A. It does.

Q. Okay. And it expressly requires that someone who is seeking indemnification after receiving an indictment needs to promptly request indemnification; correct?

A. I've -- we've had this discussion. It is my position that we promptly requested it 2015 with the catchall. Amtrak Police were involved in that investigation that ultimately led to his arrest. And if, as I've said to the Bostians, if my 2015 email is not considered sufficient request, we're out of the box on this indemnification action anyway and we are -- you've never requested it, because I guess prompt is in 2015. And my catchall is what I thought I -- everything was in. Which is why I told Greg Bostian in 2017 that I didn't think it was necessary, but I'll send it.

Q. So, in June of 2015 there had not yet been an

indictment; correct?
A. Correct.
Q. And I think what you marked as Exhibit 2 is the response of Amtrak to the initial request for indemnification that you sent by email in 2015; correct?
A. Correct.
Q. And that response says that Amtrak will provide a defense in all claims and civil lawsuits filed against you; correct?
A. Let me just --
Q. It's the first paragraph.
A. Yeah. This -- it's my request -- that's what Amtrak says. Amtrak said Robert Goggin's email, dated June 22nd, '15 requesting that Amtrak provide you a defense in all claims and civil lawsuits filed against you related to the Frankford Junction derailment of May 12th, '15.
Q. Okay. And then in response Amtrak agreed to defend Mr. Bostian in connection with civil lawsuits filed against him for personal injuries arising from the derailment; correct?
A. That's all that existed at the time, yes.
Q. Okay. And, so if you believed that you had requested indemnification already for the criminal defense costs in 2015, why didn't you ask Amtrak to reimburse the Bostians for criminal defense costs while they were going into their retirement funds and trying to fund the criminal defense?

A. Because the bylaws say in a criminal matter -- a person must not have had reasonable cause to believe that his or her conduct was unlawful. And that was the whole point of the criminal trial, that's what -- what they're finding their conduct to be.
Q. So, it was your view that Mr. Bostian had criminal -- reasonable cause to believe his conduct had been unlawful?
A. It was my view that Amtrak could have reasonably -- reasonable reason to believe that his conduct was unlawful until the jury determined it. If the jury found him not guilty I don't think Amtrak has the ability to say that we still believe his -- his conduct was unlawful. But until that occurs, they have -- they have to wait for the decision, just like we do.
Q. Did you ever make an effort to discuss with Amtrak which criminal counsel Mr. Bostian was retaining for his criminal defense, or, you know, the reasonableness of the rates, anything about the criminal defense costs with Amtrak?
A. No. I would say that -- apparently they were the appropriate amount, because he was found not guilty, as was appropriate.
Q. Back to the Rule 26(f) report. The parties jointly proposed a case schedule in this matter; correct?
A. Yes.
Q. Okay. And that -- what we proposed was December 15th,

2023 as a deadline for summary judgment motions; correct?
A. I'll -- I'll take your word. I don't have it in front of me, I believe it's something like that.
Q. Okay. I'm happy to share a copy.
A. I believe you.
Q. Okay.
A. I'll agree with that.
Q. And at the time we filed that joint report the FELA (phonetic) case was already set for trial on December 14th, 2023; correct?
A. Picking the jury --
Q. Right.
A. On the 14th.
Q. Okay. And in fact the trial date for the FELA case was -- for picking a jury was set before you filed this federal lawsuit; correct?
A. That's correct.
Q. Okay. Mr. Goggin, do you have a police report about your stolen laptop?
A. I had one for the 2015 laptop. I don't have it any longer. I did not make one for the 2022 stolen laptop. Although I did make a fuss with my building because -- the only person -- I went to the -- they have video cameras, but only on the -- only on the elevators. And that evening the only person that went up and down in the elevators was the

cleaning person. It was stolen between -- I don't know what days of the week were, but when I left on a Tuesday and I -- I got back on a Wednesday morning.

Q. And your legal assistant is named Patricia Micucci?

A. Yes.

Q. Okay. Has -- she's been working for you since about August 2016; correct?

A. Sounds -- sounds right, a long time.

Q. Okay. She was working for you in 2017; right?

A. Yeah.

Q. Okay. And in general she types up your letters for you; correct?

A. No. I would say in general I do most of my own work. I'm -- I'm very self-contained. I -- I travel around a lot. But, she does a lot of -- if there are form letters that go out, and I say send out interrogatories, she'll send out that letter. If -- if send out -- request a deposition, she will do that. But, things that I have to, you know, think about my own letter and what have you, I do -- I do them myself for the most part.

Q. Okay. Do you recall sending a letter to one of Amtrak's counsel of record in this case on -- Mr. Rick Hohn in July of 2023 asking Amtrak to file an answer?

A. No.

MS. HARRISON: Your Honor, may I approach?

THE COURT: You may.

Q. -- mark this for identification as Exhibit? Mr. Goggin, does this refresh your recollection about whether you sent a letter to Mr. Hohn in July of 2023?

A. Yep.

Q. Okay. And if you look at the bottom left hand corner you see your initials, and then slash P-A-M?

A. Yes.

Q. Okay. So, that's a sign that -- that Ms. Micucci typed this letter for you; correct?

A. I would believe so.

Q. Okay. So, this is a request for a response to an -- to a complaint. Isn't it possible that Ms. Micucci would have been involved in creating a supposed letter to Amtrak in 2017?

A. This letter was sent because Mr. Hohn was asking for additional time to respond to the complaint and I was under time constraints on the FELA matter and -- and this happening. And I was in discussions with my client as to what's the better course of action. This is a kind of letter I would say, Patty, send this letter out, what have you. The letter that I would send regarding indemnification, she wouldn't -- she wouldn't know how to handle that. This is the only indemnification case I've ever handled in -- in all of my years representing Amtrak unions. And I couldn't tell

her just type up a letter saying we want indemnification. It had to be a little -- a little nuanced.

Q. So, you didn't ask her to check her computer to see if she has any record of the 2017 letter?

A. I -- I checked the computers.

Q. Okay.

A. All of them. I know that I -- I do everything on my own laptop. I travel with it. It's with me ninety percent of the time. I searched mine first to see if those -- that information had come over to the new laptop. I searched the -- her laptop. There was nothing to be found. Had I found something, none of us would be here.

Q. Okay. Did you ever tell Mr. Bostian that you recreated Exhibit D in 2022?

A. In 2022, I did tell him. I can't tell you when I told him.

Q. Before the complaint was filed he knew that that was a recreation; correct?

A. I don't know the answer to that. I know I discussed it with him after our depositions in 2022 where I had -- where I gave the -- that letter that we had discussed to Barbara Maine. I had a discussion with him then.

Q. So, that was about October of 2022 I think; correct -- those depositions?

A. I don't -- I don't know. Yeah, maybe.

Q. Hang on, I have a transcript. Give me one second.

(BRIEF PAUSE)

Q. Does -- does October 26th, 2022 for a deposition of Barbara Maine sound approximately correct to you?

A. It could have been that day. She was there for all the depositions that we did and they were over many days.

MS. HARRISON: Okay. I have only one copy, Your Honor, of the Maine deposition transcript. Oh, maybe I have two. Okay. May I approach?

THE COURT: Sure.

MS. HARRISON: Thanks. We'll mark this as Exhibit 7.

Q. Does this refresh your recollection about the date of the Maine deposition?

A. I know that I was with Barbara Maine on October 26, '22.

Q. Okay. And does that then refresh your recollection about approximately when you would have discussed the recreation of that 2017 letter with your client?

A. No, it was -- I don't -- I can't tell you -- they took -- those deposition took several weeks. When I had that discussion with my client, I -- I can't -- I can't be sure.

Q. But it would have been in the year of 2022; can we narrow it down that much?

A. I'm unsure. I -- I know I had the discussion with him. I had -- I had to tell him what was -- what was going on, and

I did. I may have done that when -- during the dec action. Nothing -- nothing occurred. Nobody -- nobody said anything to me about the -- letter until after the dec action had occurred.

Q. Right, and then --

A. So, it -- it could have been -- it could have been after the dec action had occurred. I don’t -- I don’t -- well, let me do this. I know that I discussed it with him once Amtrak had made a fuss about the letter. I know I discussed it with him then. When I discussed it with him before that, I couldn’t -- I couldn’t tell you.

MS. HARRISON: Okay. No more questions, Your Honor.

THE COURT: All right. A couple follow-up questions.

MR. GOGGIN: Certainly.

RE-DIRECT EXAMINATION BY THE COURT:

Q. So, you had a laptop stolen from your office in 2015, and another in 2022?

A. Yes, sir.

Q. So, after the laptop was stolen in 2015 did you take any measures, whether electronically or security wise to help secure your data or prevent theft?

A. We moved to a building that had someone in the lobby.

Q. I’m sorry, I didn’t catch that.

A. We moved to a building that had someone in the lobby. And you would need a swipe card to get in on weekends and things of that nature. And, I thought the building was secure, but it’s not secure if the person who cleans your offices in the evening is the person who steals your laptop.
Q. In the 2022 incident, I -- I think I heard you say you did not file a police report; is that right?
A. In 2015 there was some sensitive litigation going on and I had information on my laptop that I thought would be relevant to that litigation. And I filed a police report as -- just as a safety measure. In 2022 the -- needless to say, I -- I filed a police report in 2015 and I knew nothing was going to be done. I’m a former district attorney in Philadelphia, I knew nothing was going to happen as a result of that. It doesn’t affect my -- any insurance claim that I would make for the laptop, it’s below a deductible. And in 2022 I didn’t make a police report.
Q. But it might affect some other type of insurance claim. Didn’t you think about that?
A. I did not. I did not.
Q. Okay. What --
A. I did -- I did sit for hours and look at the -- not hours, but eight hours of video tape. The only guy that came there was the cleaning guy.
Q. Is there any documentary evidence tending to show that

this theft occurred?

A. Everyone in my office knew that it happened. The building knew that it happened. And I have a receipt for -- for buying a new laptop, which is the one that I use now. --

Q. Well, maybe there was an email sent that talked about it?

A. There's -- attorney -- Judge. You know, in -- in hindsight, Judge, there's -- there's a lot that I would not have done. I would not have created that letter. I would not have -- I would have just taken my lumps as it was. But, as nothing had ever been said, other than -- in my catchall email from 2015, and I didn't have to worry about it again until 2022, I just -- there was a lot I would have done different, Your Honor. And I -- and I wish that I had, but I didn't.

Q. Was the 2017 letter -- it was originally sent -- let me ask you it this way. What was the delivery method of the 2017 letter?

A. It was just mailed.

Q. Postal mail?

A. Judge, I thought of that, too. Why didn't I send an email like I did the first time? I -- I don't know. I don't -- I don't know.

Q. And was any paper copy or scan made of that original letter?

A. No, we had switched -- if -- if I had it, Judge, I would have pulled it out and done it. I don't -- I don't keep paper copies anymore. I -- I -- listen, I recognize that this is a vulnerable position to be in. I'm -- I am not here to tell you that everything was done up to snuff. It -- it was sloppy and it got sloppier.
Q. Right, and part of the reason for my questions is to explore those facts and circumstances, make sure I understand everything --
A. I searched everything, Your Honor.
Q. Yeah -- so, what about electronic backups? Certainly by 2017 it was commonplace to have your documents backed up in a cloud or something like that. Nothing?
A. And when my -- when I would do work in the office I had backup. When I would do work outside of the office I did not.
Q. I don't understand that. --
A. I don't either.
Q. Oh.
A. So, if I just typed up a letter and printed it out and -- and sent it, nothing -- nothing comes into my office and then all of a sudden everything from my office is on office computers. There aren't -- at the time there wasn't really a centralized system. In fact, the -- the laptop that I just got in -- recently, because it -- it's already completely --

like the drive on it is already completely full. I would have taken it to somebody to figure out how this can be full already, but with all this going on I don't want to touch it. I'm -- I'm not savvy enough to answer your questions. I can tell you this, I have people coming in to make sure that nothing like this can happen again. I did read opposing counsel's comment in one of our things that emails normally go to the cloud or something of that nature for the 2015 email. I can't find it. I can't find it. I would have -- if that was the case, I would have it.

Q. Going back to 2017, did -- do you recall during that time whether -- specifically what the letter or generally during that time did you use Microsoft Word?

A. I don't recall, Judge.

Q. One way or the other -- did you ever use Google docs?

A. I don't think so.

Q. Okay. Okay.

(BRIEF PAUSE)

THE COURT: I don't think -- I don't think I have any other questions at this time. Did you have any follow-up questions?

MS. HARRISON: No, Your Honor.

THE COURT: Did you have anything you wanted to add at the end?

MR. GOGGIN: Nothing, sir.

THE COURT: Okay. You can step down.

(WITNESS STEPS DOWN)

THE COURT: So, Counsel, I had a couple questions for Mr. Brandon Bostian. And is -- is Mr. Greg Bostian here?

MR. G. BOSTIAN: Here, Judge.

THE COURT: Okay. I have a couple of questions for each of them. Is there any problem with that?

MS. HARRISON: No -- no, Your Honor.

THE COURT: Okay. Let's have Mr. Brandon Bostian come to the stand, please.

(WITNESS STEPS UP)

COURT CLERK: -- step up.

MR. B. BOSTIAN: Thank you.

COURT CLERK: Stand for one minute, sir.

MR. B. BOSTIAN: Okay.

COURT CLERK: Sir, state your name for the record?

MR. B. BOSTIAN: Brandon William Bostian.

COURT CLERK: Spell your last name.

MR. B. BOSTIAN: B as in bravo, O-S-T-I-A-N.

COURT CLERK: Please raise your right hand for me.

B R A N D O N   B O S T I A N, WITNESS, SWORN.

COURT CLERK: Thank you. Please, sit.

DIRECT EXAMINATION BY THE COURT:

Q. Mr. Bostian, so -- just to make sure we're on the same page, you appreciate what we're talking about is a 2017

letter -- an alleged 2017 letter requesting indemnification for your criminal matters. Are we on the same page?

A. --

Q. Okay. When did you become aware, if ever, of an interest or a need in requesting indemnification for criminal matters?

A. I'm not sure I understand. You're asking when did I become interested?

Q. Or -- you know -- at least I would assume for someone in your situation you were becoming educated on issues such as indemnification during that time; right?

A. Right.

Q. So, when did -- when did you start thinking about the issue of the criminal -- criminal indemnification?

A. Immediately after getting charged and looking for a defense attorney.

Q. Okay. Did you -- with respect to this 2017 letter, did -- did you request that Mr. Goggin send the letter?

A. I did.

Q. Did you ever see a copy of it?

A. I don't remember ever seeing a copy.

Q. Did you ever ask for a copy of it?

A. I can't remember if I did or not.

Q. Yeah, did you ever ask for follow up as to whether that indemnification had been agreed to?

A. I don’t have a specific memory, but I’m sure that I did. It was something that I was very concerned about.

Q. Okay. What about -- what we have in front of us here in this is case is what’s been characterized by your attorney as a recreation of that 2017 letter. When did you become aware that -- that a recreation of that letter had been filed with the complaint in this case?

A. The first that I heard about it was when Amtrak made the allegation in -- a month -- a month or two ago.

Q. Okay. Did you review the complaint and the attachments at the time the complaint was filed?

A. I can’t remember if I reviewed it before or after, but right about the same time, yeah.

Q. So, when -- so that means that you had seen the recreation letter around the time the complaint was file -- filed; is that right?

A. I think so, yes.

Q. And did you assume that it was the real deal?

A. That was my assumption.

THE COURT: Okay. Cross?

MS. HARRISON: No, Your Honor. Thank you.

THE COURT: Okay. Mr. Goggin, if you have any questions, you can add to the record.

EXAMINATION BY MR. GOGGIN:

Q. Mr. Bostian -- excuse me -- when -- in 2015 did you make

-- was it you that made a request for indemnification through me to Amtrak?

A. That was the very -- in the very beginning, and you told me that they would indemnify it. And I think that you sent the paperwork over -- I'm sure I asked you to.

Q. And did we discuss it again after you had been criminally charged?

A. We did.

Q. Were you told that an indemnification letter was sent, if you recall?

A. I don't recall if I was told it was sent or not, but I know that we discussed it quite a bit.

MR. GOGGIN: Okay. Thank you. No other questions.

THE COURT: Okay. Any follow up?

MS. HARRISON: No, Your Honor.

THE COURT: All right. Thank you, Mr. Bostian.

MR. B. BOSTIAN: Thank you, Your Honor.

(WITNESS STEPS DOWN)

THE COURT: And then next could we have Mr. Greg Bostian, please?

(WITNESS STEPS UP)

COURT CLERK: -- name for the record?

MR. G. BOSTIAN: Max Gregory Bostian, B-O-S-T-I-A-N.

COURT CLERK: Raise your right hand for me, please.

M A X   G R E G O R Y   B O S T I A N, WITNESS, SWORN.

COURT CLERK: Thank you sir. Please --

DIRECT EXAMINATION BY THE COURT:

Q. Thank you, Mr. Bostian. The question I have for you -- questions I have for you are similar to the ones I had for Mr. Brandon Bostian. At some point did you ask Mr. Goggin to make an indemnification request for Mr. Brandon Bostian's criminal matters?

A. I talked to him about the indemnification. I didn't know what was required. I just -- doing -- when we were doing the interviews -- I said is there a way to get indemnification? He said, absolutely, but you can't be indemnified until the verdict comes out.

Q. Mmm hmm.

A. And then in December at a hearing I asked him had -- had he done what he needed to? He said, yes. I sent a letter to them.

Q. Okay. And did you just say when that happened, that conversation?

A. December 2017 I think is when it was. We had two hearings before Judge Streeter Lewis, and I remembered one was in December and one was in February. And I remember it as being December, could -- but it could have been February.

Q. Mmm hmm.

A. But I'm pretty sure it was December that I asked him if

he followed up, and he said he had sent a letter.
Q. Did you ever see a copy of the letter?
A. I did not. I did not request to see it. I -- if he said he sent it, I assumed he sent it.
Q. Okay.
A. And I'm obviously not a lawyer, so I didn't know what was required.
Q. What about with respect to -- you understand one of the things we're talking about here is a letter that was attached to the complaint in this case that's been characterized by Mr. Goggin as a recreation of the 2017 letter. Do you understand all that?
A. Yes, sir.
Q. Okay. Did you review -- not necessarily saying that you should or shouldn't, this is just did you review the complaint and the attachments in this case before it was filed or when it was filed?
A. I scanned it, I wouldn't say -- detail reviewed it, but I scanned it.
Q. Okay.
A. Scanned the file and it didn't say anything unusual.
Q. Did you notice the letter -- the 2017 letter?
A. -- letter attached and I scanned it, but -- I assume that's what he told me that he had sent.
Q. Okay. You assumed it was the real letter?

A. Yes, sir.

Q. When did you become aware that it was actually a recreation?

A. During the motion to dismiss with -- prejudice or something.

Q. Okay. When it was -- when it came to light in this case -- during the dispute in this case?

A. And I think he had -- I think -- I think that's the first time that I --

THE COURT: Okay. Any cross?

MS. HARRISON: No, Your Honor.

THE COURT: Okay. Mr. Goggin?

MR. GOGGIN: Just one, Your Honor.

CROSS-EXAMINATION BY MR. GOGGIN:

Q. Mr. Bostian, did you ever discuss the indemnification specifically with your son?

A. Did I -- yes, sir.

RE-DIRECT EXAMINATION BY THE COURT:

Q. Sometimes it's risky asking questions, because then someone else thinks of questions. Going back to 2017, in December of 2017 you came to understand from Mr. Goggin that a request for indemnification had been made; right?

A. Correct --

Q. For the criminal matters --

A. Correct.

Q. Did you ever ask for followup?
A. What do you mean followup?
Q. Well, as far -- did you ever -- during that time, as far as you knew, that request had not been granted; right?
A. He -- he told me when we discussed it during the interviews, he said that he could not be reimbursed until after a verdict came out.
Q. I see.
A. So -- so I had no reason -- I did followup, I think it was December, and say did you do something? And he said, yes, I sent a letter.
Q. Yeah.
A. And I had no reason to think that there would be any -- anything coming back as a result of that.
Q. I see.
A. -- as him.
THE COURT: Yes. Nothing further?
MS. HARRISON: No questions.
MR. GOGGIN: Nothing further, Your Honor.
THE COURT: Okay. Thank you, Mr. Bostian.
MR. G. BOSTIAN: Yes, sir.
(WITNESS STEPS DOWN)
THE COURT: Let’s see. So, Counsel, I do think it would be helpful for you to present your witnesses, so why don’t you proceed with that?

MS. CHEN: Right. Your Honor, since Mr. Goggin in his testimony mentioned my co-counsel Mr. Hohn during deposition of Ms. Maine, we'd like to put Mr. Hohn on the stand --

THE COURT: Sure.

MS. CHEN: Just to follow up with questions before Ms. Maine come on the stand; if that's okay?

THE COURT: Fine by me.

(WITNESS STEPS UP)

COURT CLERK: Sir, state your name for the record?

MR. HOHN: Richard Hohn, H-O-H-N.

COURT CLERK: Please raise your right hand.

R I C H A R D H O H N, WITNESS, SWORN.

COURT CLERK: Thank you, sir.

DIRECT EXAMINATION BY MS. CHEN:

Q. Mr. Hohn, were you at Ms. Barbara Maine's deposition dated October 26, 2022?

A. I was at her deposition on that date and on a few other dates with -- she was at attendance at other people's depositions, yes.

Q. You were the attorney defending those depositions on behalf of Amtrak; correct?

A. That's correct.

Q. So, on October 26, 2022 during Ms. Maine's deposition, were you with Ms. Maine the whole time of the deposition?

A. I would say, you know, other than her going to the ladies room or something like that.
Q. Have you ever heard of Mr. Goggin saying to Mr. -- Ms. Maine that the letter was not the original?
A. No, certainly not.
Q. During the -- Mr. Bostian’s criminal proceedings were you present in the courtroom often?
A. In the original -- in the runup to the -- the trial there were a number of evidentiary hearing and there were hearings -- Amtrak had been requested by the Court to present certain documents that would aid Mr. Bostian in his defense. And I was there each of those hearings. And then during the criminal trial either myself or one of the associates from my office were at trial every day, and I think it was mostly Robert Stroh that was there.
Q. And you saw Mr. Goggin in -- in those times that you were in the courtroom; right?
A. Those times and others, yes.
Q. Did he ever ask you anything about a letter he sent in 2017 asking for indemnification Mr. Bostian’s criminal defense?
A. No. And the subject of indemnification for those criminal cases -- to my -- it never came up. I never heard about it until you know much later, when we were doing these depositions in you know 2022, that’s the first time I ever

heard about it.

Q. Final question. Mr. Goggin sent an Amtrak in the course of this case some financial statements related to the criminal case; right?

A. Right.

Q. Was there any legal invoice or bills among those statements?

A. No. I had been asked by Amtrak to find out what -- you know what Bob was asking for. And, so I kept getting you know receipts from -- from the Bostian family for you know their travel up here to attend this and that, and you know withdrawal slips from their bank account. And I -- I don't know, it must have been five times I said, Bob, can you send me the bills that you and Brian sent to these folks? And I never got those, so I reported to Amtrak I can't -- you know, I can't get this information.

MS. CHEN: Thank you, Mr. Hohn. No more questions.

THE COURT: Okay. Mr. Goggin?

CROSS-EXAMINATION BY MR. GOGGIN:

Q. In our -- excuse me. In our discussion regarding those bills you requested a written bill from the attorneys as to what they charged for what was services provided; correct?

A. Well, that's right. I mean it's one thing for the client to say this is what I paid, but you know every attorney that I know -- Bob, you -- you present a bill.

That's how -- that's how you get paid.

Q. And during our discussion at that time I told you that I charged nothing for the criminal trial, that Brian McMonagle charged and you would have to get a bill from him. Did he -- did he ever send you a bill --

A. And I did, and I could not get a bill from Brian either.

Q. Okay. But, you did get all of the monies that were spent with explanations from Greg Bostian; correct?

A. Bob, I got withdrawal slips from -- Mr. Goggin, withdrawal slips from -- from Mr. Bostian. I got receipts for staying at Holiday Inns up here.

Q. Mr. -- Mr. Bostian, I believe I told you was an accountant; correct? Or was an accountant.

A. His father, yeah Mr. Bostian -- Greg Bostian.

Q. Okay. And he sent you the check summaries for checks that he had sent --

A. Right.

Q. And who they were written out to, McMonagle, Perri, McHugh, $100,000.00 and a withdrawal slip? And he sent you statements from his retirement account, he sent you canceled check for experts, $20,000.00 written to me for Brandon Bostian legal escrow? We sent you bank statements, which he highlighted as to specific expenses for hotels and stays when he came up here?

A. Right, that's just what I testified to. What I was

trying to find out is what the Bostians were charged for the criminal defense. That was something that was never -- never explained.

Q. That is an item that would come from Brian McMonagle, as I told you; correct?

A. And he said that he didn't have any -- he didn't have any bills. -- prepare --

Q. But you have all the -- you have all the canceled checks that were written out specifically to Brian McMonagle and his firm?

A. How -- how do I know that? How do I know that?

Q. Do you think that Mr. Bostian didn't submit any, was holding some back when he was looking to be reimbursed for them?

A. I don't -- I don't know what -- I don't know what you mean by that. I don't know what you mean by that.

Q. Mr. Bostian is presenting to you the monies that he spent on a criminal trial. And you're saying -- do you believe he spent more than that and didn't give it to you or he spent -- or that this wasn't spent on --

A. Mr. Goggin, I have no idea. What I was asked by my client to find out is what is it that they are looking for, and that's why I kept writing to you saying please send me a copy of the bills that were sent to these folks.

Q. And I sent you the only thing that I had was -- the only

thing I could get is what Greg Bostian sent to me --
A. Mr. Goggin, I don't --
Q. You're looking for a bill?
A. I don't know what Mr. Bostian sent to you, and I don't know what it is that you had or didn't have.
Q. Okay.
A. But what you did not provide me was a copy of any bill that was submitted to these folks for the criminal defense. That's what I never got.
Q. But we did have a discussion that an amount was discussed with Mr. McMonagle and a check was written. I don't know whether there was a bill submitted. But, that discussion you and I had; correct?
A. I -- you're going to have to refresh my memory about that. Everything that we did, we did by emails. And I get --
Q. We never had conversations about this on the telephone?
A. We may have, Bob. We've spoken about many things on the telephone.
Q. Okay.
A. Over the years we've spoken of many, many things on the telephone.
MR. GOGGIN: Nothing further, Your Honor.
MS. CHEN: No further questions, Your Honor.
THE COURT: Thank you, sir.

MR. HOHN: Thank you, Your Honor.

(WITNESS STEPS DOWN)

MS. CHEN: Your Honor, may I call Ms. Barbara Maine to the stand?

THE COURT: Yes. Ms. Maine?

(WITNESS STEPS UP)

COURT CLERK: State your name for the record.

MS. MAINE: Barbara Maine.

COURT CLERK: Spell your last name.

MS. MAINE: M-A-I-N-E.

COURT CLERK: Raise your right hand for me.

B A R B A R A  M A I N E, WITNESS, SWORN.

COURT CLERK: Thank you, ma'am. Have a seat.

DIRECT EXAMINATION BY MS. CHEN:

Q. Good afternoon, Ms. Maine.
A. Hi.
Q. Are you currently employed?
A. Retired.
Q. Which employer did you retire from?
A. Amtrak.
Q. When did you retire from Amtrak?
A. June of 2023.
Q. How long did you work for Amtrak before retiring?
A. Twenty years.
Q. Now we're not going to go through your entire tenure at

Amtrak. Focusing on 2017, what was your position at Amtrak then?

A. I was a Manager of the New York Claims Office.

Q. Did you have the same position as the Manager of the New York Claim Office until your retirement in 2023?

A. Yes.

Q. What does claims in your job title mean?

A. Any FELA cases, employee cases, injuries, personal injuries, or passenger injuries that came into the office.

Q. Can you please describe your job responsibilities as the Manager of New York Claims?

A. I would manage -- over -- oversee, assign cases to my claim reps, assign law suits to outside counsel for the New York territory.

Q. Do you know who Mr. Brandon Bostian is?

A. Yes.

Q. Who is he?

A. He was the engineer on Train 188 derailment.

Q. Did Mr. Bostian bring any lawsuit against Amtrak arising from the derailment of Train 188?

A. Yes.

Q. Were you the claim representative at Amtrak for Mr. Bostian's claim?

A. I was. I was working out of the Philadelphia office at the time.

Q. What kind of lawsuit did Mr. Bostian bring against Amtrak?
A. FELA, Federal Employees Liability Act.
Q. Do you know who Mr. Robert Goggin is?
A. Yes.
Q. Who is he?
A. He is Brandon Bostian’s Plaintiff counsel. I’ve known Bob probably for twenty years.
Q. How did you know him?
A. Interaction as Plaintiff counsel on other FELA cases.
Q. Did you communicate with him often during your tenure at Amtrak?
A. Yes.
Q. And can you describe how he normally communicate with you?
A. Telephone, email, correspondence.
Q. And would he directly email you or would he have someone else do it?
A. Usually if it was correspondence it would usually come from his admin, an attachment, and he would be copied.
Q. Do you know who his admin is?
A. Her name was Pat. I don’t remember her last name.
Q. Does Patricia ring a bell?
A. Patricia -- I don’t know -- remember her last name.
Q. That’s all right. Ms. Maine, did you ever speak with

Mr. Goggin in 2022 about a demand for indemnification of Mr. Bostian’s legal costs in his criminal case?
A. In the Fall of 2022 during depositions.
Q. Before the deposition did you talk with Mr. Goggin about the indemnification for Mr. Bostian’s criminal case?
A. It came up. He had asked for a lot of items and it came up in one of those items. And I told him, I said I don’t know what you’re talking about. I don’t have it. Can you send me a copy of it? And he emailed it to me, and that email was the first time I saw it. And something like that would have gone to Washington. It would not have come to me directly anyway.
Q. Were you --
THE COURT: Sorry to interrupt. Could you clarify the -- the it and the that in your answer?
A. The letter for indemnification would have went to the law department directly in Washington, not to me for an FELA case.
Q. As the claim representative for Mr. Bostian’s claim would you have a copy of that letter, even if it was sent to the Washington --
A. I can’t hear you.
Q. Sorry. As the claim representative for Mr. Bostian’s claim, even if the letter had gone to Washington, would you have a copy of that in your file?

A. Yes. Washington would have dropped it into the file itself. They have the ability to do that.
Q. So, focusing on the Fall 2022 conversation that you had with Mr. Goggin and he sent you an email attaching the letter dated 2017, did he ever tell you had recreated the letter as sent you the -- recreation?
A. No, never.
Q. Did he ever tell you that he had lost the original version of the letter?
A. No. The -- the email that he sent me was the first time I saw anything -- the email said that his computer was stolen or lost, and then the letter was attached to that email. That was the first time I knew anything about it.
Q. He didn't say in that email that he lost the letter; right, did he?
A. No.
Q. Now, you -- you were just in the courtroom listening to Mr. Goggin's testimony; right?
A. Yeah.
Q. And then you'll remember his saying that during your deposition he handed over the letter to you and he told you that this was not the original. Now did he ever say that to you?
A. The first time I saw that letter was in the email. The -- the letter that was attached to his email was the first

time I ever saw that letter. I -- I do not believe that he ever handed me a copy of that letter.
Q. Not during your deposition?
A. No.
Q. Now, when you received the letter through Mr. Goggin's email for the first time what were your thoughts then?
A. Just the email itself said that he lost his computer. The -- the letter that was attached was dated 2017. There was no signature. The address to Washington was our new address. In 2017 we hadn't moved yet to the new address. And it just set up a couple of red flags to me. And I forwarded it to Washington and I said this is not in my file. Do you have this anywhere? And the Law Department looked for is. They had -- they did -- they did not have it.
Q. Ms. Maine, if -- if Mr. Goggin had told you in the Fall of October of 2022 that he recreated this letter, he's lost the original, would you have said or done things differently?
A. I -- I mean we have a business relationship. I mean we -- we had a business relationship over the years, and he -- if he would have said something like that, I might have looked around you know in my file. I mean I did -- looked around for it, and I couldn't find it, period. But, I don't think I would have been as aggressive looking for this letter in Washington if I had already known it was recreated. I -- I had no idea it was recreated. He never said that.

Q. Okay. Just a couple more questions. Ms. Maine, in preparation for today's testimony did you review any of Mr. Bostian's legal briefs in this case?

A. Yes, I did.

Q. Was there anything in Mr. Bostian's legal briefs that was not accurate?

A. That I knew about this. I did not know about this. He did not tell me that that letter was recreated. Really, that's -- that's it.

MS. CHEN: No further questions.

MR. GOGGIN: If I may, Your Honor?

THE COURT: You may.

CROSS-EXAMINATION BY MR. GOGGIN:

Q. Ms. Maine, during those depositions -- let -- let's start with the email. The first time you saw the letter was in an email; correct?

A. Yes.

Q. The email was a few days or a week before those depositions; give or take?

A. I honestly don't remember if it was before or after the deposition.

Q. Okay. In between depositions of corporate designees do you recall very specifically me handing you a copy of the letter that was in the email?

A. The attachment?

Q. The attachment.

A. I will say that, no I did not get it. The reason I'm saying that is because as soon as I got that email with the attachment I forwarded it right away. And after those depositions every day I went to our Philadelphia office. I did not get on the train and go back to New York, I went to Philadelphia first. And if I did have -- was handed that, I would have turned that over in the Philadelphia office to my law department director, who was in that office every day.

Q. You don't remember handing that letter to Rick Hohn --

A. No, I do not.

Q. Who read it and said we never got this?

A. I don't remember that.

Q. I'm going to ask you to -- to think long and hard. I handed you that letter at the deposition, subsequent to the email, and I told you that this was not an original. I'm asking you to think long and hard. You took it, you folded it, you stuck it in your file -- then Rick Hohn looked at it, read, and said we never received this.

A. I do not remember that at all. I -- I would have remembered -- this was a high-profile case from the get-go. And I kept -- I documented everything I did or happened, and I do not remember this. I remembered getting that letter via email.

MR. GOGGIN: Thank you, Ms. Maine.

MS. CHEN: No further questions, Your Honor.

THE COURT: Okay. Thank you, Ms. Maine.

(WITNESS STEPS DOWN)

MS. HARRISON: Just one more witness. We'd call Mr. Bill Herrmann, who was the person to whom the letter was addressed.

THE COURT: Oh, that's fine.

MS. HARRISON: Okay. Thank you.

(WITNESS STEPS UP)

COURT CLERK: Sir -- step --

MR. HERRMANN: Thank you.

COURT CLERK: Sir, just state your name for the record.

MR. HERRMANN: William Herrmann.

COURT CLERK: Spell your last name.

MR. HERRMANN: H-E-R-R-M-A-N-N.

COURT CLERK: Please raise your right hand for me.

W I L L I A M  H E R R M A N N, WITNESS, SWORN.

COURT CLERK: Thank you, sir. Have a seat.

DIRECT EXAMINATION BY MS. CHEN:

Q. Good afternoon, Mr. Herrmann.

A. Good afternoon.

Q. What is your employer and your job title?

A. My employer is Amtrak. I am the Senior Deputy General Counsel and Assistant Corporate Secretary.

Q. Where are you currently based?
A. Our headquarters are at One Massachusetts Avenue in Washington, DC.
Q. How long have you been working for Amtrak?
A. Just under twenty-four years now.
Q. Were you based at Amtrak's headquarters in Washington, DC in 2017?
A. I was.
Q. In May 2017 was Amtrak's headquarters at the same address as now?
A. It was not.
Q. What was the address then?
A. We were located in Union Station, which is 60 Massachusetts Avenue NE.
Q. And when did Amtrak's headquarters move to the current address?
A. We moved over that summer. The official move date was September of 2017.
Q. Do you know who Mr. Brandon Bostian is?
A. I do.
Q. Who is he?
A. He was the engineer on Train 188.
Q. Do you know who Mr. Robert Goggin is?
A. I do.
Q. Who is he?

A. He is Mr. Bostian's attorney.
Q. Did you receive any letter in 2017 from Mr. Goggin asking for indemnification for Mr. Bostian's criminal defense?
A. I did not.
Q. In preparation for today's testimony did you conduct any investigation to confirm that you did not receive any letter from Mr. Goggin in 2017?
A. I did.
Q. What did you do to confirm?
A. I searched my own files and I asked that our chief paralegal search all of our files for any communications from Mr. Goggin.
Q. And what did you find?
A. We found no communication.
Q. Are you aware of anyone else at Amtrak receiving a letter from Mr. Goggin in 2017 requesting indemnification for Mr. Bostian's criminal defense?
A. I am not.
Q. Did Mr. Goggin ever follow up on any request for indemnification for Mr. Goggin's -- sorry -- Mr. Bostian's criminal defense costs at any time between 2017 and October 2022?
A. No.
Q. Mr. Herrmann, are you familiar with the prompt notice

requirement for employee indemnification requests in Amtrak's bylaws and policy of indemnification?

A. I am.

Q. When should an employee submit a notice or request for indemnification under Amtrak's policy?

A. Immediately upon notice of the criminal action or a civil action against them.

Q. And, Mr. Herrmann, why does Amtrak require an employee immediately notify Amtrak for any request for indemnification?

A. So, we're required under our policies and the bylaws to review the application and make sure they meet the standard of conduct outlined in there, to also make sure that they execute the agreement for the undertaking, and then to work with any outside counsel that might be retained to make sure they have an engagement agreement and that the attorneys fees that might come in for recovery are reasonable.

Q. Does it make a difference if the proceeding is criminal versus civil when it comes to the prompt notice requirement?

A. No.

Q. Does the employee need to wait until a verdict in a criminal trial to submit a request?

A. No, just the opposite.

Q. Is the employee allowed to wait until a verdict in a criminal trial to submit a request?

A. No, the policy and bylaws require it to be immediately upon notice.
Q. Was the same policy in effect in 2017?
A. Yes.
MS. CHEN: No further questions.
THE COURT: Mr. Goggin?
CROSS-EXAMINATION BY MR. GOGGIN:
Q. Mr. Herrmann.
A. Good afternoon.
Q. How are you?
A. Good.
Q. You received my email in 2015 regarding indemnification?
A. For the civil case, yes.
MR. GOGGIN: So, I'm going to share with you -- I'm going to ask you to take a look at -- what's been marked as Exhibit 2. May I approach, Your Honor?
THE COURT: You may.
A. Thank you.
Q. Are you familiar with that, sir?
A. This is my memo, yes.
Q. And in your -- in your memo of June 29, 2015 you indicate in the first paragraph that Robert Goggin's email dated June 22, '15 requesting Amtrak provide you a defense in all claims and civil suits filed against you; is that correct?

A. That is what it says, yes.
Q. What does -- what does all claims mean to you?
A. At that point we were on notice of the civil lawsuit.
Q. But -- and the civil lawsuits were identified individually; correct? All claims and civil lawsuits; correct?
A. I'm not sure I understand.
Q. But, I'm asking for your understanding. If indemnification is coming, Amtrak Police are investigating for potential criminal activity and civil claims exists, and someone asks you from the law department for indemnification in all claims and civil lawsuits filed against you related to the -- excuse me -- Frankford Junction derailment, would that include any administrative claims that might come?
A. I only understood it to mean the civil lawsuit that had been filed.
Q. This request under Article 9, Section 109 of the bylaws -- and you listed it here, that you say you, meaning Brandon Bostian, are entitled to a presumption of a defense unless and until there's a finding that you did not act within the scope of your duties to the corporation in good faith and in a manner you reasonably believed to be in or not opposed to the best interest of the corporation. Is that correct?
A. That's correct.
Q. Then you say in your case Section 109 requires Amtrak's

general counsel to make the finding referenced above, because you are an employee of Amtrak. Is that correct?

A. That’s correct.

Q. And you indicate that you have conferred with Vice President, General Counsel, and -- Corporate Secretary Eleanor Acheson --

A. Acheson.

Q. And it has been determined that subject to the terms outlined below Amtrak will defend you in connection with the civil lawsuits filed against you for personal injuries; is that correct?

A. That is.

Q. Was it Eleanor Acheson that made the determination that he was entitled to that defense?

A. No, I do.

Q. You did. Did you ever reconsider that determination and say that he wasn’t entitled to a defense?

A. I did not.

Q. Are you the person that would make that -- you make -- let me start this -- you made that determination initially in 2015. Are you the person -- it’s your job to actually make that determination in conjunction with the discussions with others?

A. It depends on the timing. I was supervising this group at the time.

Q. Mmm hmm.

A. So, subsequently I was supervising a different group. So, depending on the timing, I may or may not have had that responsibility.

Q. Okay. And as we -- but you were the person that would know that if this -- this determination was ever changed; correct?

A. I would.

Q. Sir, I received in discovery in the FELA case as a result of what was written here, I had requested a corporate designee deposition of Ms. Ellen Ashen (sic) --

A. Acheson.

Q. Acheson, excuse me. My request for a deposition was opposed. And ultimately I was just able to send request for admissions and some interrogatories. And I received from counsel in the FELA case, Mr. Hohn's respose to that. That specifically told me that Amtrak denied that Brandon Bostian -- I asked specifically whether that determination had been changed. And I was told that Amtrak had specifically denied that he was acting in good faith and in the interest -- best interest of the corporation. Did that ever happen?

A. I don't recall that.

Q. But you would be the person who did it; correct?

A. I believe so.

Q. And that was -- attached to that there was an attorney

verification, which is not allowed in State Court in Pennsylvania. Are you aware of that?

A. No, I'm not.

Q. And maybe this is a just a little naivete on my part. I was under the impression that indemnification for Brandon Bostian was denied in the criminal case because that determination had been changed. That is not the case?

A. I'm not aware of a request for the indemnification in the criminal case.

Q. Well, we can argue as to whether a defense in all claims and civil lawsuits filed against you includes a -- but that's a -- that's a discussion for a different day now. I understand your position. But, my -- my thought was that Amtrak denied his criminal indemnification because as is required under your bylaws, the -- in the event of a criminal case Amtrak would have to make a finding that he did not act -- that he -- he did not know -- let me -- excuse me. May I get the proper language, Your Honor?

And in the event of a criminal proceeding, must not have had reasonable cause to believe that his or her conduct was unlawful. If a -- if I received a pleading from Amtrak that said they in fact did deny that, would that be a reason to deny his criminal indemnification?

A. Would that be a reason that --

Q. Yeah -- would you even be allowed to indemnify him if

you believe that in the case of a criminal proceeding that Amtrak had reasonable cause to believe that his conduct was unlawful?

A. I don't know.

Q. And that never occurred?

A. I don't know.

MR. GOGGIN: Okay. No further questions.

MS. CHEN: Just a couple -- Your Honor?

THE COURT: Sure.

RE-DIRECT EXAMINATION BY MS. CHEN:

Q. Mr. Herrmann, Amtrak never made any determination about criminal -- indemnification eligibility for Mr. Bostian; right?

THE COURT: Let's try to go with open -- open-ended --

Q. Sorry. Did Amtrak make any determination regarding criminal indemnification for Mr. Bostian?

A. No.

Q. Why not?

A. We never received a request for such indemnification.

Q. And Mr. Goggin just showed you what has been marked as Exhibit 2, which is a memo authored by you on June 29, 2015. At the time were there any criminal proceedings against Mr. Bostian?

A. No, not that I was aware of.

Q. At the time what was your understanding of the scope of Mr. Bostian's request?
A. It was limited to the civil proceeding.
THE COURT: Can you -- that was -- our mics are pretty good, but can you give that answer again?
A. It was limited to the civil proceeding. I'm sorry.
Q. Was that -- meaning limited to the civil indemnification what Amtrak provided to Mr. Bostian?
A. Yes.
Q. Did he ever protest that there was no inclusion of criminal indemnification in -- in your memo?
A. No.
MS. CHEN: No further questions.
THE COURT: Re-cross?
MR. GOGGIN: No, Your Honor.
THE COURT: Okay. Thank you, sir.
(WITNESS STEPS DOWN)
THE COURT: Any more witnesses from either side?
MR. GOGGIN: Your Honor, may I call -- recall Mr. Hohn?
THE COURT: Any objection? Okay.
MS. HARRISON: No objection.
THE COURT: Sure. It is pertinent to something that was heard since he took the stand?
MR. GOGGIN: Yes, sir.

THE COURT: Okay. That’s fine.

(WITNESS STEPS UP)

THE COURT: Just a reminder, you’re still under oath, sir.

MR. HOHN: Of course. Thank you.

RE-CROSS EXAMINATION BY MR. GOGGIN:

Q. Mr. Hohn, you heard me discuss a pleading with Mr. Herrmann; correct?

A. I heard something about it, but I didn’t see the whole pleading.

Q. You responded to interrogatories or requests for admissions regarding specifically whether Amtrak had changed their mind as to whether Mr. Bostian was acting in good faith in the best interest of the company of the company at the time of the Amtrak 188 crash; correct?

A. I heard you say that, but I haven’t seen it.

Q. You did not provide me with a response that said Amtrak denied that he was acting in good faith and --

A. I think that what we denied was that Amtrak ever received notice of a request for indemnification. I think that’s what my answer was.

Q. Sir, this had nothing to do with notice of indemnification. This was in the FELA case. And I specifically asked Amtrak whether they changed their mind or their determination. And the response I got was that they

did. Are you denying that?
A. Am I denying that that's the response that you got?
Q. Yeah.
A. I don't know, Bob. I don't know. I'll be happy to take a look at it and -- and tell you. If you have it, I'll -- I'll take a look at it.
Q. I wish I had brought it with me, Mr. Hohn. I did not expect the answer that I got from Mr. Herrmann.
A. Well, let's -- let's narrow it -- let's narrow it down.
Q. No, Mr. Hohn, I -- I have a few questions for you.
A. Okay.
Q. We'll take -- we're going to have an opportunity to take a look at that. Are you going -- are you telling this Court that when we sat with Barbara Maine that I did not hand her a paper copy of the letter that's an issue here today?
A. I never saw anything.
MR. GOGGIN: Thank you, Mr. Hohn.
MS. HARRISON: No --
THE COURT: Thank you, sir.
(WITNESS STEPS DOWN)
THE COURT: Okay. Any further witnesses?
MS. HARRISON: Not from Amtrak, Your Honor.
THE COURT: Okay.
MR. GOGGIN: No further witnesses, Your Honor, but I would like to supplement the record with the pleading that

I referred to.

THE COURT: There will be an opportunity. That’s what we’re going to talk about next. So, first a little cleanup from this hearing. There were exhibits discussed. The Plaintiff had five, I guess six exhibits, because there was a 3 and a 3a, and then Defendant had two exhibits. So, we have 1, 2, 3, 3a, 4, 5, 6, 7. A couple of them are duplicative of something already on the docket, but I think the neatest way to clean up our record here would be to get those on file. So, just to keep it simple I’ll ask -- and let me ask this. Are there any objections to any of those eight exhibits?

MS. HARRISON: None, Your Honor.

MR. GOGGIN: None, Your Honor.

THE COURT: Okay. Then I’ll just ask Plaintiff’s counsel to file your six exhibits on the docket, and just file them as hearing exhibits. And, likewise, Defendant to file your two exhibits. And then we can have the record complete; okay? Okay.

Next question I have is what is the status of the FELA trial? Where are we at with that?

MR. GOGGIN: We’re picking the jury on Thursday, Your Honor.

THE COURT: Okay. So, it’s charging ahead. All right.

Next question I have is with respect to this case, I know this -- the motion practice here leading to this hearing we've -- we've gone down a -- kind of a windy pathway, but if we could rewind to the beginning, it was a motion to dismiss without prejudice. And, so I just want to get clarity on the relief where everyone is seeking. On the Plaintiff's side is it still your position to be seeking a dismissal without prejudice?

MR. GOGGIN: Your Honor, that was my initial request, as to see where we were heading with the FELA case. I had two tracks going here. I am adding the damages for the criminal trial into the FELA case. I believe I will be successful there. I -- I have no ultimate problem with this being dismissed with prejudice as I am -- as I am proceeding in the FELA case with the same damages. And I -- if I win them there, I can't come and ask for them again here. It's a contract action, but the damages are the same. That's my understanding anyway.

THE COURT: Do you have any concerns about the other way around if a dismissal with prejudice here could have consequences?

MR. GOGGIN: My -- my -- my client certainly does, which is why we're here, why we're asking for it be dismissed without prejudice. But, that's -- that's where I -- that's where I am.

THE COURT: Okay.

MR. GOGGIN: I am not asking this Court to dismiss it with prejudice. I'm saying, I'm -- I'm proceeding on those damages on Friday of this week.

THE COURT: Okay. I think I understand that, but -- at least understand it enough for now. From -- on Amtrak's side, you know initially there -- you opposed the motion to dismiss, but then you said well we should do one of two things. We should either deny the motion to dismiss and we should force discovery on all this and -- and -- and dive into these issues, which we've kind of done. Or -- or two, there should be a dismissal, but it should be with prejudice, and then throw in like a fee request in there. What -- what's your -- you know what order would you put these things in? What do you want or what's your backup?

MS. HARRISON: So -- right, so our preference would be both dismissal with prejudice, which we think would have res judicata effects, as well as fees and costs for the amount of time and expense incurred associated with defending this case and investigating the sort of fabrication of evidence associated with it.

As a backup we would -- we would prefer that this case not be dismissed, if not with prejudice, and we would litigate it here. But, we would maintain our request for fees and costs.

THE COURT: Okay. I think we probably all understand that I -- I will never be the decider of whether there is res judicata effect. That's going to be a problem for the State Court.

But, okay I understand the relief we're looking for. So, here's what we're going to do next. I'm going to issue an order after this asking for some more briefing. And something -- let's see, the first -- something for the Plaintiff to consider is that in my mind a dismissal with prejudice is -- is on the table. It's on the table. It would have probably been on the table just because of the lateness of the hour in this case. But, really the -- as you might imagine, the controlling problems are with this letter that was filed with the complaint and the issues that we've discussed during this hearing. So, in my mind dismissal with prejudice is on the table. So, part of the function of the additional briefing, Mr. Goggin, will be for -- for you to respond to that and to make any further arguments you have about not wanting a dismissal with prejudice. Also, you would have the option of withdrawing your motion to dismiss, if -- that's in your control. If you withdraw your motion to dismiss, you want to keep going in this case, that's an option that you have. And I think it's incumbent on me to -- to allow you to think about that and brief it and -- and tell me what you want to do. That's number one.

Number two, as for fees, I -- I think it's on the table. I think it's a little under briefed for me right now, and I think this hearing was necessary to -- you know, build a factual record so that that could be briefed. If -- if fees are something that Amtrak would like to do, my suggestion would be to put together a motion with the appropriate authorities, whatever it is you think's appropriate, and then -- and -- and the factual records. And that's something that Plaintiff would have a chance to respond. So, I can look at that thoroughly it probably would make sense to wait on that until after there's a disposition on the motion to dismiss. That would be my suggestion.

Then the last, and it's not -- it's not something I -- I like saying, and I have not had to do it yet in -- in -- since I've taken the bench. But, I -- I am going to have to send a letter to the Chief Judge of this Court, Mr. Goggin, about this matter and about what's happened, under our local rules with respect to whether there should be any discipline against you and your practice before this Court. Our Court has a procedure for that. It's Local Rule -- it's under our local rules. I think it's -- for your reference, I think it's -- it's Local Rule 83.6. The way that it works is there's a notice and opportunity to be heard. So, if the Chief Judge takes it up, there probably will be an Order to Show Cause and follow our court's procedures. So, I'm not

going to short circuit that, try to do anything myself. But, I am going to -- I am going to send that letter. I feel as though I have to in this situation.

Okay. So, all that's going to go into the Order following this hearing, and there will be some additional briefing. And I know you're about to be -- all be very distracted for the next little while, so I'll put some time in there, too, so you're not having to deal with this right in the middle of your trial. All right. Any questions for me before we break up?

MR. GOGGIN: No, Your Honor.

MS. HARRISON: Thank you, Your Honor.

THE COURT: Okay. All right. Have a good rest of your day, and good luck with the trial.

COURT CLERK: All rise.

THE COURT: You can go about your business. I have to clean up.

(Proceeding concluded at 1:56:40 p.m.)

*****

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.

Transcriptionist: Andrea Semanovich

/s/ Andrea Semanovich December 14, 2023

Andrea Semanovich, AD/T 704

Certified Court Transcriptionist

For RedDoor Legal Services, LLC